IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN JOSEPH KOBE, | No. C 05-1237 MJJ (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |
| v. | |
| A. KANE, | |
| Respondent. | |

Stephen Joseph Kobe ("petitioner") is a California prisoner incarcerated in Soledad, California, who filed this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging a 2004 decision by the California Board of Parole Hearings ("Board")[1] to deny him parole. Respondent has filed an answer, and petitioner has filed a traverse.

## BACKGROUND

In 1980, petitioner pled guilty to first degree murder in San Diego County Superior Court, and sentenced to a term of 27 years to life in state prison. In 2004, petitioner appeared pro se at a parole hearing before the Board; at which time, petitioner had served approximately 24 years in prison. The Board found petitioner unsuitable for parole, and petitioner unsuccessfully challenged this decision in habeas petitions to all three levels of the

---

[1] At the time of the decision, the Board was called the California Board of Prison Terms.

G:\PROSE\MJJ\HC.05\KOBE.DNY.WPD

California courts. Petitioner raised the same claims in his state habeas petitions as those raised herein, namely: (1) that the Board's finding petitioner unsuitable for parole violated his right to due process because it was not based on sufficient evidence; (2) the Board has an "anti-parole" policy; and (3) the Board's denial of parole violates the "spirit and terms" of his plea agreement, in violation of his right to due process.[2]

## DISCUSSION

### A. Standard of Review

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgement of a State court only on the ground that he is in custody in violation of the Constitution or the laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975). Under AEDPA, this Court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" clearly established United States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. Early v. Packer, 537 U.S. 3, 8 (2002) (quoting Williams, 529 U.S. at 405-06). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

---

[2]A fourth claim, based on state law, was dismissed from this case for failure to state a cognizable basis for federal habeas relief.

United States District Court
For the Northern District of California

prisoner's case. Williams, 529 U.S. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); Rice v. Collins, 126 S. Ct. 969, 975 (2006).

B.   Legal Claims

   1.   The Board's Decision Was Based on "Some Evidence"

Petitioner argues that the Board's denial of parole violated his due process rights because the decision finding him unsuitable was not supported by the evidence. A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128-29 (9th Cir. 2006) (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)); see also Irons v. Carey, 479 F.3d 658 (9th Cir. 2007). The standard of "some evidence" is met if there was some evidence from which the conclusion of the administrative tribunal could be deduced. See Hill, 472 U.S. at 455. An examination of the entire record is not required nor is an independent assessment of the credibility of witnesses or weighing of the evidence. Id. The relevant question is whether there is any evidence in the record that could support the conclusion reached by the [administrative] board. See id. Additionally, the evidence underlying the Board's decision must have some indicia of reliability. McQuillion, 306 F.3d at 904.

In assessing whether or not there is "some evidence" supporting the Board's denial of parole, this Court must consider the regulations which guide the Board in making its parole suitability determinations. California Code of Regulations, title 15, section 2402(a) states that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for

and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." The regulations direct the Board to consider "all relevant, reliable information available." Cal. Code of Regs., tit. 15, § 2402(b). Further, they list sets of circumstances tending to indicate whether or not an inmate is suitable for parole. Cal. Code of Regs., tit. 15, § 2402(c)-(d).[3] However, these circumstances are meant to serve as "general guidelines," giving the Board latitude in the weighing of the importance of the combination of factors present in each particular case. Cal. Code of Regs., tit. 15, § 2404(c).

The regulations also contain a matrix of suggested base terms depending on the murder degree and the circumstances surrounding the murder. The matrix provides three choices of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years, to a high of 19, 20 or 21 years, depending on certain facts of the crime.[4] Although the matrix is to be used to establish a base term, this occurs only once the prisoner has been found suitable for parole. Id. § 2403(a). The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure

---

[3] The circumstances tending to show an inmate's unsuitability are: (1) the commitment offense was committed in an "especially heinous, atrocious or cruel manner;" (2) previous record of violence; (3) unstable social history; (4) sadistic sexual offenses; (5) psychological factors such as a "lengthy history of severe mental problems related to the offense;" and (6) prison misconduct. Cal. Code of Regs.,tit. 15, § 2402(c). The circumstances tending to show suitability are: (1) no juvenile record; (2) stable social history; (3) signs of remorse; (4) commitment offense was committed as a result of stress which built up over time; (5) Battered Woman Syndrome; (6) lack of criminal history; (7) age is such that it reduces the possibility of recidivism; (8) plans for future including development of marketable skills; and (9) institutional activities that indicate ability to function within the law. Cal. Code of Regs., tit. 15, § 2402(d).

[4] One axis of the matrix concerns the relationship between murderer and victim and the other axis of the matrix concerns the circumstances of the murder. The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," "no prior relationship," and "threat to public order or murder for hire." The choices on the axis for the circumstances of the murder are "indirect," "direct or victim contribution," "severe trauma," or "torture." Each of the choices are further defined in the matrix. See 15 Cal. Code Regs. § 2403(c).

Case 3:05-cv-01237-MJJ   Document 11   Filed 05/18/07   Page 5 of 10

term uniformity. Dannenberg, 34 Cal. 4th at 1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "*public safety*" concerns requiring further indefinite incarceration. (Italics added.) Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*.

Id. at 1070 (emphasis, brackets, and parentheses as in original). In sum, "the Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually." Id. at 1071. The California Supreme Court's determination of state law is binding in this federal habeas action. Hicks v. Feiock, 485 U.S. 624, 629 (1988).

In this case, the Board found that Petitioner was not suitable for parole because the commitment offense "demonstrates a disregard for human suffering" and had a trivial motivation, petitioner needed additional therapy, and petitioner needed to improve his parole plans. (Resp. Ex. B at 38-42.)

        (i)    Commitment Offense

Under state law, the Board may consider the gravity of the commitment offense in assessing an inmate's suitability for parole. Cal. Penal Code § 3041(b); 15 Cal. Code Regs, § 2402(c). The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (2002) ("The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than

the minimum necessary to sustain a conviction for that offense."). Moreover, the federal constitutional guarantee of due process does not preclude the parole board from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability. Sass, 491 F.3d at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing); Irons, 479 F.3d at 660, 665 (finding commitment offense and prior offenses amounted to some evidence to deny parole).

The facts of petitioner's crime were summarized in a report to the Board as follows:[5]

> [O]n the night of 11/15/79, victim Wendell Le Blanc [], a Marine stationed at Camp Pendleton, and Kenneth Belliveau [], a fellow Marine, traveled to Oceanside to purchase some liquor and were waiting at a bus stop to return to the base. Kobe drove up to the pair and offered them a ride. The owner of the car, Michael A. Nicholson [] was the passenger. The pair of Marines accepted the offer and entered the car. Kobe drove off the freeway and parked near a Mobil station. Kobe and Nicholson got out to urinate, leaving the two Marines in the car. When they returned, Kobe went to the driver's side and flipped the seat forward. He demanded money and LeBlanc said he had the wrong people, as they had none. As he began to get out of the seat, Kobe drew a revolver and pointed it at him. LeBlanc said, ["]you're not going to shoot us[."] LeBlanc called for Belliveau to ["] get out of here[."] Kobe cocked the weapon and fired it into the victim's face. Fearing for himself, Belliveau dropped his body to the floor. As he did a second shot was fired, the bullet going over his head and through the right rear window.

(Resp. Ex. 2 at 21-22; see also Resp. Ex. 3 at 2-4.) Kobe did not speak about the crime at the parole hearing, but the Board considered the following statements by petitioner about the crime at a recent psychological evaluation:

> Inmate Kobe stated that he decided to travel to California to see his childhood friend, Michael Nicholson. While staying with Mr. Nicholson, the inmate realized that Mr. Nicholson was AWOL from the Marine Corps. Mr. Nicholson had a wife and a new baby and was falling behind on his bills. He stated at the time they were both broke and as a result, they were not using drugs. They decided to commit robberies of servicemen because Mr. Nicholson knew when they would be paid.
> Mr. Nicholson and inmate Kobe picked up the two servicemen and in the process of attempting to rob them, one of the servicemen pushed the seat forward and tried to get out of the backseat. Inmate Kobe stated that his action frightened him and he shot. He stated he has no memory of the second shot at th other victim but that . . . this occurred, he simply can't remember doing that. He stated that he was very frightened during this offense and that he was

---

[5]These facts are included in the "Liver Prisoner Evaluation Report" submitted to the Board, and are not disputed by petitioner herein.

extremely stupid at that point in his life.

(Resp. Ex. 2 at 52-53.) Petitioner also expressed remorse at having committed the murder. (Id.)

The foregoing facts of the offense provided sufficient evidence that petitioner demonstrated a disregard for human suffering, see Cal. Code of Regs., tit. 15, § 2402(c)(1), (1)(B). Petitioner shot the victim in the face and at close range without provocation, and then shot at the other Marine, only barely missing him. Petitioner also admitted that the murder weapon had been stolen, that he "just went on about life" after the murder, and that he "didn't think about" whether he might kill the victim when he shot at him. Furthermore, murdering the victim in order to rob him was certainly a trivial motive compared to the gravity of the offense, see Cal. Code of Regs., tit. 15, § 2402(c)(1)(E). Consequently, there was "some evidence" that the facts of the commitment offense met the factors set forth in the state's regulations for indicating that petitioner was not suitable for parole.[6]

### (ii) Unstable Social History

Under the pertinent regulations, the Board may consider whether the inmate had an "unstable social history" in reaching its parole decision. See 15 Cal. Code Regs. §§ 2402(c)(3); 2402(d)(6). Here there was undisputed evidence that petitioner had been using drugs from the age of 14 to the time of the murder, including, marijuana, cocaine, LSD, and methamphetamine. This constituted "some evidence" that petitioner's social history was unstable.

---

[6] The Court is aware of the concern expressed by the Ninth Circuit in Biggs, that "over time" the Board's "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment" would "raise serious questions involving his liberty interest in parole." 334 F.3d at 916. However, the Ninth Circuit has recently criticized this statement as beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Moreover, in this case, as of the time of the Board's parole hearing petitioner had served 24 out of his 27-year sentence. Cf. Irons, 479 F.3d at 660, 665 (finding facts of commitment offense and prior history alone sufficient evidence to deny parole to inmate who had served 16 years of 17-year sentence). Moreover, although the Board's denial of parole may have been in large part based upon Petitioner's commitment offense, there were other reasons for their denial of parole as well. Therefore, Petitioner's instant case does not implicate the concerns raised in Biggs.

(iii)   Additional Factors

The Board also cited several other factors in reaching its decision. First, although petitioner received a positive evaluation by a psychologist, the Board concluded petitioner had not succeeded in self-help programs insofar as petitioner had characterized himself as "stubborn" and not needing to participate in such programs. See 15 Cal. Code Regs. §§ 2402(b), (c)(5) (allowing consideration of prisoner's mental state and mental history). The Board further noted that petitioner had received nine disciplinary rules violations reports between 1980 and 1998, and concluded that his progress in remaining discipline-free was only relatively recent. See 15 Cal. Code Regs. § 2402(c)(6) (prison misconduct factor in parole decision). The Board further found petitioner needed to improve his "plans for future including development of marketable skills." 15 Cal. Code of Regs. § 2402(d)(8). Although petitioner had plans for housing and he had some marketable skills, he did not have a job offer as a means to support himself after his release. Finally, the Board noted the prosecution's opposition to parole as a factor in its decision. See 15 Cal. Code Regs. § 2402.

Under these circumstances, there was "some evidence" to support the Board's findings that petitioner needed to improve his self-help participation, his prison disciplinary record, and his parole plans. Especially when these matters are combined with the nature of the commitment offense and petitioner's history of drug use, there was certainly "some evidence" to support the denial of parole in this case, and thus the Board's decision did not violate Petitioner's due process rights. Consequently, neither the Board's decision nor the state court opinions upholding the Board's denial of parole are "contrary to" or an "unreasonable application of "clearly established Federal law." 28 U.S.C. § 2254(d)(1). Further, the decision was not based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," because there was "some evidence" in the record to support the finding of Petitioner's unsuitability for parole. 28 U.S.C. § 2254(d)(2).

2.   Petitioner Was Not Denied Parole Based on an "Anti-Parole" Policy

Petitioner argues that his parole denial was pursuant to an alleged "anti-parole" policy

held by the Board. He maintains that parole is routinely denied to convicted murderers serving indeterminate sentences. Even if petitioner could show the existence of such a policy, the transcript of the proceeding and the decision show that the Board considered Petitioner's suitability on an individual basis and in considerable detail. (Resp. Ex. 2.) The decision reflects this individualized treatment of the Petitioner's case. As described above, the decision was based on more than Petitioner's commitment offense and his status as a convicted murder serving an indeterminate sentence. Based on the records presented to the Court, there is no indication that the Board's decision was based on an "Anti-Parole Policy," as opposed to the particular factors of petitioner's case.

### 3.  Plea Agreement

Finally, petitioner claims the Board's denial of parole violated the terms of his plea agreement. "Plea agreements are contractual in nature and are measured by contract law standards." United States v. De la Fuente, 8 F.3d 1333, 1337 (9th Cir. 1993). And, if a guilty plea was "induced by promises, the essence of those promises must in some way be made known." Santobello v. New York, 404 U.S. 257, 261-62 (1971). Here, as a result of his plea agreement, petitioner is serving a term of 27 years to life, rather than facing a possible charge of "special circumstances" which could result in the death penalty. To begin with, the Board was not a party to the plea agreement, so its denial of parole cannot be characterized as a "breach" of such agreement. In any event, there is no indication or allegation that the plea agreement included any promise that petitioner would serve less than the maximum life term or that the Board would grant petitioner parole, let alone that he would be granted parole 24 years into his term of 27 years to life. Consequently, the Board's denial of parole in 2004, when petitioner had served the less cannot be said to have "breached" petitioner's plea agreement.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED:  5/17/2007

_____
MARTIN J. JENKINS
United States District Judge